IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NEW BALANCE ATHLETICS, INC.,     )
     )
     Plaintiff,     )
     )
     v.     )   C.A. No. 17-1700 (MN)
     )
USA NEW BUNREN INTERNATIONAL     )
CO. LIMITED LLC,     )
     )
     Defendant.     )

## MEMORANDUM OPINION

Arthur G. Connolly, III, Ryan P. Newell, CONNOLLY GALLAGHER LLP, Wilmington, Delaware, Thomas L. Holt, Jeremy L. Buxbaum, PERKINS COIE LLP, Chicago, Illinois.  Attorneys for Plaintiff.

Dennis J. Butler, John D. Simmons, PANITCH SCHWARZE BELISARIO & NADEL LLP, Wilmington, Delaware, Timothy T. Wang, NI, WANG & MASSAND, PLLC, Dallas, Texas.  Attorneys for Defendant.

December 4, 2019
Wilmington, Delaware



NOREIKA, U.S. DISTRICT JUDGE

Plaintiff New Balance Athletics, Inc. ("New Balance") is a company that manufactures and markets athletic apparel and footwear. Defendant USA New Bunren International Co. Limited LLC ("New Bunren") is a Delaware limited liability company formed in 2012 for the purpose of distributing and selling in the United States shoes and other products made by Qierte Corporation Ltd. ("Qierte"), a Chinese company that has been found liable by a Chinese court for infringing New Balance's trademarks in China.

New Balance has asserted claims against New Bunren based on federal and state law for, among other things, trademark infringement, trademark dilution, and unfair competition. Currently pending before the Court are the parties cross-motions for summary judgment. (D.I. 52; D.I. 54; D.I. 58). Although New Balance has asserted claims based on its word marks and its "N" marks, the parties seek summary judgment only as to the "N" marks." (D.I. 26; D.I. 58). The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367. For the following reasons, New Balance's motion for summary judgment is granted in part and denied in part, and New Bunren's motions for summary are denied.

I.      **BACKGROUND**

A.      **Parties**

New Balance was founded in 1906 and first started using its "N" marks in commerce in 1974. (D.I. 60 ¶ 4; D.I. 57-1, Ex. I at No. 1). It is now a global company offering products in more than 120 countries. (D.I. 72-1, Ex. 10 at 17). Defendant New Bunren is a Delaware limited liability company formed by Shy Fu Pao on July 23, 2012 as Little Pres. LLC. (D.I. 66 ¶¶ 1-2). The name was changed to New Bunren on July 28, 2014. (*Id.*).

**B.     New Bunren's "N" Marks.**

Between July 2014 and October 2016, New Bunren registered U.S. Trademark Nos. 4,568,883; 5,055,943; 4,580,787; 4,585,058; 4,860,914; and 4,878,478 with the U.S. Patent and Trademark Office.  (D.I. 66 ¶ 3).  In New Bunren's trademark applications, the stylized "N" contains a flying bird design as seen in the images below:

| '787 Mark | '058 Mark | '914 Mark | '478 Mark |
|---|---|---|---|
| | | | |

(*Id*.).  The flying bird design, however, is not always apparent on New Bunren's products, as shown in the image below:



(D.I. 60 ¶ 3; D.I. 64 ¶ 3; D.I. 72-1, Ex. 9).

According to New Bunren, all of its "N" marks are based on marks successfully registered by Qierte in China.  (D.I. 57-1, Ex. C at No. 1, Ex. D).  Shy Fu Pao simply registered Qierte's "N" marks in the United States.  (*Id*., Ex. B at 24:18-25:1).  Qierte's "N" marks in China were purportedly an extension of an earlier stylized mark called "Naiyao" (reproduced below), wherein the letter "N" was purportedly designed as a flying bird within the letter "N."  (*Id*., Ex. C at No. 1). The parties do not explain the relationship between Qierte and Naiyao or whether Naiyao was a

company, a product, or something else.  New Balance disputes the details of the Naiyao origin story.  (D.I. 66 ¶ 5).



(D.I. 57-1, Ex. E).

To sell New Bunren's products, Qierte designed and managed a website for New Bunren with the url http://www.new-bunren.com.  (D.I. 66 ¶ 6; D.I. 57-1, Ex. B at 89:11-13).  The website was active from 2015 to 2017 or 2018, and displayed products bearing New Bunren's "N" marks.  (D.I. 66 ¶ 6; D.I. 57-1, Exs. G, H).  The website prominently described New Bunren as an "American Classic," and captioned one photograph with the words "New Balance (China) Sports Goods Co., Ltd."  (D.I. 57-1, Ex. H).[1]  There was no pricing information or purchasing instructions on the website.  (D.I. 66 ¶ 6).  But it did provide a "contact us" form.  (*See* D.I. 57-1, Ex. G).  In addition, the website at one point had an Alabama phone number that consumers could call if they were interested in purchasing the products.  (*Id*., Ex. B at 116:7-17).  Shy Fu Pao resides in Alabama.  (*Id*. at 8:10-13).  New Bunren claims that none of its products were shipped to or sold in any physical stores in the United States.  (D.I. 66 ¶ 6).  Notably, this leaves open the possibility that its products could have been sold through the internet and directly shipped to a consumer.

## II.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

---

[1]  Shy Fu Pao testified that the appearance of "New Balance" was a typo that should have said "New Bunren."  (D.I. 57-1, Ex. B at 129:16-130:6).  She neither designed nor managed the website, however, and it is unclear what foundation she had for this assertion.

Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv*., 409 F.3d 584, 594 (3d Cir. 2005) (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (internal citations omitted).

## III.    DISCUSSION

For six of the eight claims in its first amended complaint, New Balance has moved for summary judgment only as to its "N" marks.  (D.I. 26).  Those claims are: (i) infringement of a federally registered trademark under Latham Act § 32(1), 15 U.S.C. § 1114(1); (ii) trademark dilution under Lanham Act § 43(c), 15 U.S.C. § 1125(c); (iii) false designation of origin under Lanham Act § 43(a), 15 U.S.C. § 1125(a); (iv) trademark dilution under Delaware statutory law, 6 Del. C. § 3313; (v) deceptive trade practices under Delaware statutory law, 6 Del. C. § 2532; and (vi) trademark infringement and unfair competition under Delaware common law.[2]  For all of the federal trademark claims, New Bunren asserts the same defense, that its activities were not "in commerce" as required by the statute.  Accordingly, the Court will address this common defense before addressing the merits of the individual claims.  Finally, New Balance has also moved for summary judgment on its request for statutory damages and attorneys' fees.

### A.    "In Commerce"

New Bunren asserts that its activities were not "in commerce" as required by the Lanham Act.  (D.I. 55 at 6; D.I. 63 at 8-10, 13).  Section 1114 of the Lanham Act, Title 15, United States Code, forbids a party to "use *in commerce* any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion . . . ."  (Emphasis added).  Under § 1125(a)(1), a defendant is liable if he or she uses "*in commerce*" a mark which: (i) "is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person;" or (ii) "in

---

[2]    New Balance has not moved for summary judgment on its claims for unjust enrichment and false or fraudulent registration.

commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." (Emphasis added). Under § 1125(c), an owner of a famous mark may obtain an injunction to stop "use of a mark or trade name *in commerce* that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark." (Emphasis added).

In support of its argument, New Bunren also cites § 1127, which defines "use in commerce" as follows:

> (1) on goods when—
>
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
> (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.

It appears that the Third Circuit has not yet addressed this issue, but several courts have held that the definition of "use in commerce" in § 1127 sets the standard for a mark to qualify for protection or registration, not the standard for proving infringement. *See VersaTop Support Sys., LLC v. Georgia Expo, Inc.*, 921 F.3d 1364, 1370 (Fed. Cir. 2019) (reversing district court because the definition of "use in commerce" in § 1127 "does not apply to trademark infringement"); *BTG Patent Holdings, LLC v. Bag2Go, GmbH*, 193 F. Supp. 3d 1310, 1322 (S.D. Fla. 2016) (stating that the definition of "use in commerce" in § 1127 "applies only in the trademark qualification context and not in the trademark infringement context"); *Hasbro, Inc. v. Sweetpea Entm't, Inc.*, C.A. No. 13-3406 DMG (JCGx), 2014 WL 12586021, at *9 (C.D. Cal. Feb. 25, 2014) (holding

that "Section 1127 is not . . . the legal standard for proving infringement"); *see also Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 131-34 (2d Cir. 2009) (providing in lengthy dicta an analysis of the statutory text and historical evolution of the Lanham Act supporting why § 1127 applies to trademark qualifications and not infringement).

The Court finds these cases and, in particular, the analysis set forth by the Second Circuit in *Rescuecom*, persuasive. Notably, the definition of "use in commerce" under § 1127 cannot be reconciled with the activities that create liability under §§ 1114 and 1125. Specifically, § 1127 requires that goods be "sold or transported," but §§ 1114 and 1125 create civil liabilities for "offer[s] for sale" or "advertising," which are activities where goods are not necessarily sold or transported. Section 1127 states that the definitions in that section apply, "unless the contrary is plainly apparent from the context." The context of §§ 1114 and 1125 demonstrate that the definition of "use in commerce" from § 1127 is not applicable. Accordingly, the Court will not rely on it to determine infringement.

This leaves the "in commerce" requirement set forth in §§ 1114 and 1125. New Bunren argues that no products bearing New Bunren's "N" marks were shipped to or sold in any physical stores in the United States. (D.I. 63 at 9, 10). But New Bunren admits that its goods were "marketed via the www.new-bunren.com website." (D.I. 72-1, Ex. 38 at No. 9; D.I. 57-1, Ex. B at 65:15-20). That New Bunren did not actually sell any infringing products is immaterial, because liability under the Lanham Act can be based on advertising or promotion alone. *See VersaTop*, 921 F.3d at 1365-66 (holding that defendant's use of plaintiff's trademarks in advertising and brochures was sufficient to establish liability for trademark infringement); *BMW of N. Am., LLC v. Barreira*, 633 F. App'x 882, 884 (9th Cir. 2015) (finding irrelevant the fact that defendant "did not actually *complete* any sales," because "even an offer to sell goods with an infringing trademark

establishes liability under the Lanham Act" (emphasis in original)); *DealerX v. Kahlon*, No. 2:17-cv-1444-MCE-AC, 2017 WL 5664580, at *4 (E.D. Cal. Nov. 27, 2017) ("That defendant does not actually sell or provide the services advertised . . . is immaterial, as 'merely advertising an infringing mark itself is an act of infringement.'") (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 25:26 (5th ed. 2017)).[3]

New Bunren also argues that its website never displayed any pricing information or purchasing instructions. (D.I. 63 at 8, 10). As an initial matter, the website did contain a "contact us" form and at one point also had a U.S. phone number, so it was not impossible for interested consumers to inquire further. (D.I. 57-1, Ex. B at 116:7-17, Ex. G at 2-3). More importantly, there is no requirement that advertising or promotions contain pricing information and purchasing instructions, as demonstrated by billboards, print ads in fashion magazines, product placements in movies, and the sponsored wearing of items by celebrities and influencers. All of those activities are regarded as advertisements and promotions but do not necessarily contain pricing information and purchasing instructions. Stated differently, New Bunren's website may not have contained pricing and purchasing information but it was not non-commercial speech. The website stated, for example, that it "provide[s] customers . . . with excellent products" and "its products . . . are with high quality and high taste." (D.I. 72-1, Ex. 9).

---

[3]    New Bunren takes out of context the statement in *Morningside* that "[m]ere advertising and promotion of a mark in this country are not enough to constitute 'use' of the mark 'in commerce.'" (D.I. 63 at 8 (citing *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133 (2d Cir. 1999)). *Morningside* was contrasting its conclusion that plaintiff activities were sufficient to create a protectable service mark with *Buti v. Impressa Perosa, S.R.L.*, 139 F.3d 98 (2d Cir.1998), where a plaintiff's advertising activities were not sufficient to create a protectable mark. *Morningside*, 182 F.3d at 138. Here, there is no dispute that New Balance has protectable marks.

For the foregoing reasons, the Court finds that the "in commerce" requirements in §§ 1114 and 1125 have been satisfied.

**B.      Federal Trademark Infringement and False Designation of Origin**

"Federal trademark infringement, 15 U.S.C. § 1114(1)(a), and a false designation of origin claim, known more broadly as federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards." *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 580 (E.D. Pa. 2002).  Under these standards, a plaintiff must prove that: (1) it owns the mark; (2) the mark is valid and legally protectable; and (3) defendant's use of the mark to identify goods or services is likely to create confusion.  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

**1.      Ownership of a Valid and Legally Protectable Mark**

The first two elements of the claim for federal trademark infringement are met here.  "If the mark at issue was federally registered and had become 'incontestable', pursuant to 15 U.S.C. §§ 1058 and 1065, validity, legal protectability, and ownership are proved." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) (citations omitted).  Here, the "N" marks are federally registered and have obtained incontestable status.  15 U.S.C. § 1065; D.I. 72-1, Exs. 1-8.

**2.      Likelihood of Confusion**

For the third element of federal trademark infringement, a likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Ford Motor*, 930 F.2d at 292 (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*,

589 F.2d 1225, 1229 (3d Cir.1978)).  To determine whether a likelihood of confusion exists, courts

consider ten factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing
> mark;
>
> (2) the strength of the owner's mark;
>
> (3) the price of the goods and other factors indicative of the care and attention
> expected of consumers when making a purchase;
>
> (4) the length of time the defendant has used the mark without evidence of actual
> confusion arising;
>
> (5) the intent of the defendant in adopting the mark;
>
> (6) the evidence of actual confusion;
>
> (7) whether the goods, though not competing, are marketed through the same
> channels of trade and advertised through the same media;
>
> (8) the extent to which the targets of the parties' sales efforts are the same;
>
> (9) the relationship of the goods in the minds of consumers because of the
> similarity of function;
>
> (10) other facts suggesting that the consuming public might expect the prior
> owner to manufacture a product in the defendant's market, or that he is likely to
> expand into that market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).  No single factor is determinative.

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004).  The Court may afford different

factors varying weights depending on the factual setting, and the Court should apply only those

factors that seem appropriate in a given situation.  *Id.*  Neither party addressed factors four, nine,

and ten, and thus those factors do not weigh in the Court's analysis.  In fact, New Bunren only

addressed factors five and six, which cover intent and actual confusion, respectively.  (D.I. 63 at

11-12).  Nevertheless, a majority of the factors weigh in favor of finding a likelihood of confusion.

On the first factor, there is a high degree of similarity between New Balance's "N" marks and New Bunren's "N" marks. Indeed, as shown in the images below, the parties' "N" marks are virtually identical on virtually identical products.

**Representative New Balance Marks**

  

(D.I. 60 at ¶ 2).

**Representative New Bunren Marks**



(D.I. 60 at ¶ 3).

New Bunren contends that its "N" marks are not just a slanted letter "N," but instead are designed as a flying bird within the letter N. (D.I. 64 ¶ 3). The marks, however, "need not be identical." *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1063 (3d Cir. 1991). "[T]he proper legal test is not whether there is some confusing similarity between sub-parts of the marks," but "whether the marks, '*viewed in their entirety*,' are confusingly similar." *Kos*, 369 F.3d at 709 (emphasis in original) (quoting *A & H Sportswear*, 237 F.3d at 216); *see also Fisons Horticulture, Inc. v. Vigoro Indus., Inc*., 30 F.3d 466, 478 (3d Cir. 1994) (finding error where the district court "undertook a detailed analysis of the differences in the marks

rather than focusing on the overall impression created by them"). Here, as demonstrated from the images above, the flying-bird design is not apparent from the product used in commerce. Indeed, the flying bird is so inconspicuous, it leaves the overall impression that New Bunren's "N" marks are identical to New Balance's "N" marks.

On the second factor, New Balance's "N" marks are strong. To determine the strength of a mark, courts consider: (1) its "conceptual strength," which is based on "the inherent features of the mark contributing to its distinctiveness," and (2) its "commercial strength," which is based on "marketplace recognition." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 185 (3d Cir. 2010). The conceptual strength of a mark is labeled, from strongest to weakest, as "arbitrary or fanciful," "suggestive," "descriptive," or "generic." *Id.* Arbitrary or fanciful marks "bear 'no logical or suggestive relation to the actual characteristics of the goods.'" *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986) (quoting *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 374 n.8 (1st Cir. 1980)). Suggestive marks "suggest rather than describe the characteristics of the goods," and requires "imagination, thought, or perception" to reach a conclusion about the nature of the goods. *A.J. Canfield*, 808 F.2d at 296-297. Descriptive marks "describe a characteristic or ingredient of the article to which it refers" and thereby "convey[] an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* Generic marks function "as the common descriptive name of a product class." *Id.* at 296.

Here, the "N" marks are conceptually strong, because they are arbitrary: they do not describe, or even suggest, characteristics of the products with which they are associated. *See Rockland Mortg. Corp. v. S'holders Funding, Inc.*, 835 F. Supp. 182, 193 (D. Del. 1993) (stating that an arbitrary mark is "inherently distinctive and . . . relatively strong"); *Quality Semiconductor, Inc. v. QLogic Corp.*, No. C-93 20971, 1994 WL 409483, at *2 (N.D. Cal. May

13, 1994) (holding that a stylized letter "Q" mark was conceptually strong because it was "arbitrary" and "unique" within the industry). The "N" marks are also commercially strong because New Balance's has funded extensive advertising campaigns featuring the "N" marks that has led to substantial sales. New Balance annually has spent an average of $75 million in marketing and received an average of $3.4 billion in sales. *See* D.I. 57-1, Ex. I at No. 12; *Rockland*, 835 F. Supp. at 193 (holding that extensive advertising campaigns and substantial sales evidence commercial strength).

On the third factor, consumers are not likely to exercise a high degree of care when purchasing the goods at issue here. "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion." *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001). "The reasonably prudent buyer is assumed to take more care in purchasing 'expensive' items which he buys infrequently, than in buying everyday, relatively inexpensive items." McCarthy on Trademarks, § 23:96. Thus, courts have repeatedly held that buyers of athletic apparel and footwear are not likely to exercise a high degree of care. *See Adidas Am., Inc. v. Skechers USA, Inc.*, No. 3:15-cv-01741-HZ, 2017 WL 3319190, at *18 (D. Or. Aug. 3, 2017) (holding that athletic shoes "are an everyday good that does not invite careful consideration" from consumers); *K-Swiss, Inc. v. USA AISIQI Soes Inc.*, 291 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (stating that consumers are "unlikely to exercise a high degree of care" because "[a]thletic shoes are common consumer items and often are purchased several times a year"); *M'Otto Enters., Inc. v. Redsand, Inc.*, 831 F. Supp. 1491, 1502 (W.D. Wash. 1993) (stating that purchasers of "relatively inexpensive athletic and sportswear" are "not likely to exercise a great deal of care"); *Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1066 (S.D.N.Y. 1991).

Under the fifth factor, "evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion." *Checkpoint*, 269 F.3d at 286 (quoting *Nat'l Football League Props., Inc. v. N.J. Giants, Inc*., 637 F. Supp. 507, 518 (D.N.J. 1986)). The "adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant" to the intent inquiry. *Kos*, 369 F.3d at 721.

Here, New Bunren first became aware of New Balance's marks sometime between 2005 and 2010, *i.e.,* before it registered its own "N" marks in 2014. (*See* D.I. 57-1, Ex. C at No. 4). In addition, New Bunren did not perform any searches or consider any alternatives in its selection and adoption of its "N" marks. (*Id*. at Nos. 5-6). It simply registered the marks provided by Qierte, a Chinese company that successfully registered the same marks in China and was later found by a Chinese court to infringe New Balance's trademarks. (D.I. 57-1, Ex. B at 83:22-84:15; D.I. 61 ¶ 5; D.I. 66 ¶ 5; D.I. 72-1, Ex. 40). It is unclear from the record whether New Balance had challenged Qierte's use of the marks in China by the time Qierte provided them to New Bunren in 2014. It is also unclear when New Bunren first became aware or should have become aware of New Balance's challenge to Qierte's marks. Accordingly, New Bunren could have been blameless or willfully blind in registering marks that looked substantially similar to New Balance's marks. Neither party provided a complete picture of the facts with citations to relevant authorities. Indeed, New Bunren cited no case law at all in its short paragraph arguing no intent (*see* D.I. 63 at 12), and New Balance simply rehashed its arguments from the first factor regarding the similarity of the designs. (D.I. 59

at 19). Thus, the Court does not draw any conclusions regarding intent to cause confusion at this time. The fifth factor weighs neither for or against finding a likelihood of confusion.[4]

For the sixth factor, there is some evidence of actual confusion. At a deposition, New Bunren's corporate representative, Shy Fu Pao, was unable to distinguish between New Bunren shoes bearing its "N" marks and New Balance shoes bearing its "N" marks when presented with images of the shoes side-by-side. (D.I. 60 ¶ 42; D.I. 64 ¶ 42). The evidence is weak, because it involves only a single instance by a corporate representative for the defendant, as opposed to significant numbers of consumers. Nevertheless, the Court will not completely disregard it. A plaintiff is only required to prove a likelihood of confusion, so "[e]vidence of even one instance of actual confusion is significant." *Dorsey v. Black Pearl Books, Inc.*, C.A. No. 06-2940(JAG), 2006 WL 3327874, at *9 n.7 (D.N.J. Nov. 14, 2006). In addition, and contrary to New Bunren's arguments (*see* D.I. 63 at 11-12), "[t]he likelihood of confusion with which the Lanham Act is concerned is not limited to confusion of products among purchasers." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 321 (3d Cir. 2015) (reversing district court that discounted evidence of confusion because it was among brokers and dealers, rather than actual customers). Therefore, a single instance of actual confusion by a corporate representative weighs slightly in favor of finding a likelihood of confusion.

For the seventh and eighth factors, New Balance and New Bunren target the same group of consumers, using overlapping forms of advertising and channels of trade. Specifically, both parties target the general public. (*See* D.I. 57-1, Ex. C. at No. 8 (stating that New Bunren "does not target a specific class of consumers"); *Id.*, Ex. I at No. 6 (stating that New Balance "markets

---

[4]     This finding is not fatal to New Balance's claim because "[e]vidence of a defendant's intent is not a prerequisite for finding a Lanham Act violation." *Sabinsa*, 609 F.3d at 187.

its products to all consumers")). Both parties also advertise and distribute their product through the internet. (*See Id.*, Ex. C. at No. 10, Ex. I at Nos. 7, 12). New Balance relies on several websites that New Bunren does not, including Amazon, Zappos, and Backcountry, but both parties use Taobao.com. (*See Id.*, Ex. C. at No. 10, Ex. I at Nos. 7, 12).

In conclusion, the first, second, third, seventh, and eighth factors weigh strongly in favor of finding a likelihood of confusion and the sixth factor weighs slightly in favor of finding a likelihood of confusion. No factors weigh against finding a likelihood of confusion. Accordingly, the Court finds that under the *Lapp* factors, New Balance has demonstrated a likelihood of confusion. The Court grants summary judgment in favor of New Balance on Count 1, federal trademark infringement, 15 U.S.C. § 1114(1), and Count 3, false designation of origin, 15 U.S.C. § 1125(a).[5]

### C.      Federal Trademark Dilution

"The federal cause of action for trademark dilution grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion . . . if the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's famous mark." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000). To establish a prima facie claim for federal trademark dilution, the plaintiff must prove that: (1) it owns a mark that qualifies as "famous"; (2) the defendant is using the mark in interstate commerce; (3) defendant's use began after plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and

---

[5]      New Bunren moved for summary judgment of no infringement based on its assertion that New Bunren has not used its marks in commerce and New Balance's purported failure to show a likelihood of confusion. (D.I. 54, 55). For the reasons set forth in sections III.A and III.B of this opinion, the Court will deny that motion.

distinguish goods or services. *Id.* The Court has already concluded that New Bunren is using its mark in interstate commerce. *See supra* Section III.A. The remaining three elements are addressed in turn.

### 1. Famous

To determine whether a mark is famous, courts consider four factors: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) "[w]hether the mark was registered."[6] 15 U.S.C. § 1125(c)(2)(A). Based on these factors, the Court concludes that the "N" marks are famous.

New Balance's advertising has been extensive in duration, scope, and geography. New Balance has been using the "N" marks for more than forty-five years. (D.I. 57-1, Ex. I at No. 12). From 2012 to 2017, which are the five years preceding the filing of the complaint, New Balance spent an average of approximately $75 million annually on global marketing expenditures. (D.I. 61 ¶ 4). This marketing covered print media, television, online, social media, and point of sale locations. (D.I. 57-1, Ex. I at No. 12).

Sales of New Balance's products has been equally robust in terms of amount, volume, and geography. From 2012 to 2017, New Balance generated more than $20 billion in revenue

---

[6] *Times Mirror* instructs a court to consider whether the mark is famous in light of the eight factors listed in subsection (c)(1) of 15 U.S.C. § 1125. *See* 212 F.3d at 163. When Congress enacted the *Trademark Dilution Revision Act of 2006*, however, the factors listed under subsection (c)(1) were amended, reduced to four, and moved to subsection (c)(2)(A). *See* Pub. L. No. 109–312, 120 Stat. 1730. Because the Third Circuit has yet to address the amendments, district courts in this circuit have continued to apply the prima facie test established in *Times Mirror* but to substitute the new factors set forth in subsection (c)(2)(A) for the old factors listed in subsection (c)(1). *See, e.g.*, *Lingo v. Lingo*, 785 F. Supp. 2d 443, 455 (D. Del. 2011).

worldwide ($6 billion in the U.S.), and sold hundreds of millions of pairs of shoes, articles of apparel, and other merchandise bearing the "N" marks. (*Id*.; D.I. 72-1, Exs. 12, 14).

Actual recognition of New Balance's "N" marks is strong. New Balance is recognized as one of the five "leading players" in the sports footwear market, the others being adidas Group, Asics, Nike, and Sketchers USA. (D.I. 72-1, Ex. 22). For U.S. apparel and footwear in general, New Balance is ranked in the top five for overall brand health. (*Id*., Ex. 16). It has sponsorship deals with celebrities, professional athletes, and national sports teams around the world. (*Id*., Exs. 25-34).

Finally, all of New Balance's "N" marks are federally registered and incontestable. (*Id*., Exs. 1-8).

Given the foregoing facts, the "N" marks qualify as famous. *See Nike, Inc. v. Nikepal Int'l, Inc*., No. 2:05-cv-1468-GEB-JFM, 2007 WL 2782030, at *5 (E.D. Cal. Sept. 18, 2007) (concluding that Nike's marks were famous because Nike promoted the marks nationally for more than two decades, spent over a billion dollars in advertising, reached annual sales close to a billion dollars, and consistently ranked as a top brand in surveys); *Pocono Int'l Raceway, Inc. v. Pocono Mountain Speedway, Inc*., 171 F. Supp. 2d 427, 444 (M.D. Pa. 2001) (holding that marks were famous in light of longstanding use, extensive national advertising in several mediums, and their registration).

## 2.  Timing

New Bunren's use of its "N" marks began after New Balance's "N" marks became famous. New Balance started using its family of "N" marks in connection with footwear and apparel products as early as 1974. (D.I. 57-1, Ex. I at No. 2; D.I. 72-1, Ex. 1). The above facts supporting

a finding that the "N" marks were famous existed as of 2014, when New Bunren first used its "N" marks in commerce. (D.I. 72-1, Exs. 43-44).

### 3. Dilution

To determine whether dilution occurred, courts consider six factors: (1) "[t]he degree of similarity between the mark or trade name and the famous mark"; (2) "[t]he degree of inherent or acquired distinctiveness of the famous mark"; (3) "[t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark"; (4) "[t]he degree of recognition of the famous mark"; (5) "[w]hether the user of the mark or trade name intended to create an association with the famous mark"; and (6) "[a]ny actual association between the mark or trade name and the famous mark." 15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

There is a "substantial overlap" between the factors for trademark dilution and trademark infringement. *adidas Am., Inc. v. Skechers USA, Inc*., 890 F.3d 747, 759 (9th Cir. 2018). Specifically, in analyzing the trademark infringement claim, the Court has already concluded that the parties' "N" marks are "virtually identical," and that New Balance's "N" marks are arbitrary and, therefore, highly distinctive. *See supra* Section III.B.2. In addition, in analyzing whether New Balance's "N" marks were famous under the federal dilution claim, the Court has already concluded that the marks receive a high degree of recognition. *See supra* Section III.C.1. There is no need to repeat that analysis again here. Thus, the first, second, and fourth factors weigh in favor of finding dilution. This leaves the third, fifth, and sixth factors.

On the third factor, New Balance has engaged in substantially exclusive use of its "N" marks. Substantially exclusive use can be evidenced by federal registration of the trademark and significant enforcement efforts against unauthorized use. *See River Light V, L.P. v. Tanaka*, C.A. No. 17-22843, 2018 WL 5778234, at *6 (S.D. Fla. Nov. 2, 2018); *Hershey Co. v. Promotion in*

*Motion, Inc.*, C.A. No. 7-cv-1601 (SDW), 2013 WL 12157828, at *25 (D.N.J. Jan. 18, 2013). Here, the "N" marks are federally registered and have achieved incontestable status. (D.I. 57-1, Exs. 1-8). In addition, New Balance has actively policed unauthorized use by sending cease and desist letters, filing lawsuits, and filing oppositions and cancellation petitions in the Trademark Trial and Appeal Board ("TTAB"). (D.I. 61 ¶¶ 5-6; D.I. 72-1, Exs. 40, 62).

On the fifth factor, the evidence shows that New Bunren intended to create an association with New Balance. To start, the names of the companies are similar, as best demonstrated when New Bunren's corporate representative confused the names in response to several questions during her deposition. (D.I. 57-1, Ex. B at 74:10-23). Next, the name "New Balance (China) Sports Goods co., Ltd." appeared on the New Bunren's webpage, which suggests to the average consumer that New Bunren was a division of New Balance based in China.[7] (*Id.*, Ex. H at 3). Further, New Bunren's website repeatedly described its products as an "American Classic," even though its products originate from China. (D.I. 72-1, Ex. 9 at 3, Ex. 54 at 1, Ex. 55 at 1). The words "American Classic" would naturally invoke an association with New Balance, which is "currently the only footwear manufacturer still making athletic shoes in the U.S." (*Id.*, Ex. 10 at 16). And, at one time, New Balance ran an ad campaign with the tagline "Classic Then. Classic Now." (*Id.*, Ex. 23). Next, several of the shoes displayed on New Bunren's website are marked with the numbers "1974" and "999." (*Id.*, Ex. 53 at 2, Ex. 55). 1974 is the year that New Balance first used its "N" marks in commerce. (D.I. 57-1, Ex. I at No. 1). As for 999, New Balance is distinct among leading sports footwear manufacturers in using only a three-digit number, as opposed to a

---

[7]     New Bunren's assertion that the appearance of the New Balance name was a typo is not based on any credible evidence. Nevertheless, even were the Court to credit the testimony, the remaining evidence still strongly supports a finding that New Bunren intended to create an association.

word, to name its different shoe models. The "990" is known as one of New Balance's "iconic" models. (*Id.*, Ex. 10 at 15, Ex. 23). New Balance has also produced a 993, 995, and 998. (*Id.*, Exs. 14, 23). Because 999 follows the same format as these other New Balance shoes, a reasonable consumer could easily conclude that it was a part of the same model line. Finally, and most tellingly, when New Bunren applied for the "N" marks, the flying bird design was readily apparent, but when New Bunren promoted its products in commerce, the flying bird designed was abandoned, thereby leaving New Bunren's "N" marks indistinguishable from New Balance's "N" marks. (*Compare* D.I. 72-1, Exs. 45, 49, 51 *to* Exs. 54, 55).

New Balance has not submitted any evidence in support of the sixth factor – an actual association between the parties' mark. Survey results showing actual confusion "by customers, potential customers, and members of the general public" is one way to establish actual association. *Gen. Motors Co. v. Urban Gorilla, LLC*, Civ. No. 2:06-CV-00133 BSJ, 2010 WL 5395065, at \*12 (D. Utah Dec. 27, 2010). But, "a plaintiff seeking to establish a likelihood of dilution is not required to go to the expense of producing expert testimony or market surveys." *Visa Int'l Service Ass'n v. JSL Corp.*, 610 F.3d 1088, 1091 (9th Cir. 2010). In other words, a showing of actual asocation is not necessary to prevail on dilution claim. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 736 F.3d 198, 212–13 (2d Cir. 2013). Here, five of the six factors weigh in favor of finding dilution. Accordingly, the Court grants summary judgment in favor of New Balance on Count 2, federal trademark dilution, 15 U.S.C. § 1125(c).

### D.  State Law Claims

New Balance has moved for summary judgment on its state law claims for trademark dilution under 6 Del. C. § 3313 (Count 4), deceptive trade practices under 6 Del. C. § 2532 (Count 5), and trademark infringement and unfair competition under Delaware common law (Count 6).

(D.I. 58).  None of these claims was separately addressed in New Balance's briefing.  (*See* D.I. 59).

Instead, New Balance asserted in a footnote that "Delaware deceptive trade practices under

6 Del. C. § 2532, and Delaware common law trademark infringement and unfair competition are

evaluated under the same standard" as claims for federal trademark infringement and federal false

designation of origin.  *Id*. at 15 n.2 (citing *Military Certified Residential Specialist, LLC v. Fairway*

*Indep. Mortg. Corp.*, 251 F. Supp. 3d 750 (D. Del. 2017)).

New Balance's motion for summary judgment on Counts 4 through 6 is denied.  As an

initial matter, New Balance did not mention Delaware trademark dilution (Count 4) at all.  For the

remaining two state law claims, New Balance may be correct that they have the same elements as

the federal claims, but that has not been proven by the sole case New Balance cited in support.

*Military Certified* addressed a motion to dismiss, and it resolved the state law claims in a cursory

manner.  251 F. Supp. 3d at 757-58.  It did not lay out the elements of the state law claims and it

did not say that those elements are the same as found in the federal claims.  In addition, the standard

to survive a motion to dismiss is not the same as the standard to win on summary judgment.

Accordingly, the Court will not grant judgment on the state law claims in New Balance's favor at

this time.

### E.     Remedies

New Balance seeks summary judgment on its request for statutory damages and attorneys'

fees pursuant to 15 U.S.C. § 1117.[8]  (D.I. 59 at 20-26).

---

[8]     In its opening brief, New Balance also requested an injunction pursuant to 15 U.S.C. §§ 1116(a) and 1125(c)(1), but abandoned this request in its reply brief.  (D.I. 59 at 21-22; D.I. 69).

### 1.      Statutory Damages

As a threshold matter, a plaintiff cannot recover statutory damages under 15 U.S.C. § 1117(c) unless the marks qualify as "counterfeits." 15 U.S.C. § 1117(c). The amount of statutory damages available depends on whether the plaintiff also shows that "use of the counterfeit mark was willful." *Id.* Without a showing of willfulness, subsection (c)(1) provides statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1). With a showing a willfulness, the amount of statutory damages may be higher. Specifically, subsection (c)(2) grants statutory damages of "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(2).

The term "counterfeit" is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Counterfeit marks "do not need to be identical and may have minor differences that would not be apparent to the typical consumer and, thus, legally insignificant." *Astrazeneca AB v. Dr. Reddy's Laboratories, Inc.*, 209 F. Supp. 3d 744, 755 (D. Del. 2016) (finding that a mark covering the color purple includes a counterfeit with two shades of purple); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 434 (S.D.N.Y. 2012) (holding that a GC mark on sunglasses was a counterfeit of plaintiff's CC mark). For the reasons stated above, the Court has already concluded that New Bunren's "N" marks are "virtually identical," or substantially indistinguishable from New

Balance's "N" marks.  *See supra* Section III.B.2.  Therefore, New Bunren's "N" marks qualify as counterfeits.[9]

Willful trademark infringement requires "an intent to infringe or a deliberate disregard of a mark holder's rights."  *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir.1999), superseded by statute on other grounds as stated in *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 173–76 (3d Cir.2005).  "Willfulness can be inferred by the fact that defendant continued infringing behavior after being given notice."  *Louis Vuitton*, 211 F. Supp. 2d at 583.  Here, New Balance contends that New Bunren's infringement was willful, because New Bunren was given notice of its infringing behavior in January 2016 when New Balance filed a cancellation petition with the TTAB.  (D.I. 59 at 23; D.I. 60 ¶ 40; D.I. 64 ¶ 40).  New Bunren shut down its website in either 2017 or 2018 and voluntarily had its "N" marks cancelled in June of 2018.  (D.I. 60 ¶ 33; D.I. 64 ¶ 41; D.I. 66 ¶ 6).  Thus, it appears that New Bunren eventually curtailed its infringing activities voluntarily.  Why it took a year or more after receiving notice of the cancellation petition for New Bunren to shut down the website and cancel its "N" marks is unknown.  Given the foregoing facts or lack thereof, the Court is not prepared at this time to find that New Bunren willfully continued its infringing behavior after being given notice.

Nevertheless, the Court has found that New Bunren's "N" marks are counterfeits.  Therefore, New Balance is entitled at least to statutory damages under subsection (c)(1).  As stated above, the amount of damages is calculated "per counterfeit mark per type of goods or services."

---

[9]    New Bunren argues without citation to any authority that its marks are not counterfeits, because they were registered with the USPTO.  (D.I. 63 at 14).  Because New Bunren failed to cite any authority supporting its proposition that registration is relevant to the counterfeit analysis, the Court did not consider the argument.  *See United States v. Blakney*, 558 F. App'x. 300, 303 (3d Cir. 2014) (rejecting argument where party cited no authority supporting his proposition).

15 U.S.C. § 1117(c)(1). New Balance, however, was unspecific in identifying how many types of goods were offered for sale. (*See* D.I. 59 at 24 n.3 (stating that there could be anywhere between 5 to 20 different types of goods, without identifying the 5 different types of goods)). As a result, the Court draws no conclusions at this time on specific amount of statutory damages to be awarded.[10]

### 2. Attorneys' Fees

New Balance seeks an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a) or (b). (D.I. 59 at 24-25). Subsection (a) gives the court discretion to award "reasonable attorneys' fees" to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). A case is exceptional if it "stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314 (3d Cir. 2014) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014)). Subsection (b) requires the court, absent "extenuating circumstances," to award "reasonable attorneys' fees" if the defendant "intentionally us[es] a mark or designation, knowing such mark or designation is a counterfeit mark." 15 U.S.C. § 1117(b). New Balance argues that this case is exceptional, because New Bunren's infringement was willful. (D.I. 59 at 25). For the reasons stated above, the Court draws no conclusions at this time regarding whether or not New Bunren's infringement was intentional or willful. Therefore, New Balance's request for attorney's fees under either 15 U.S.C. § 1117(a) or (b) is denied without prejudice.

---

[10]   New Bunren moved for summary judgment of no damages. (D.I. 52). The Court has found that New Balance is entitled, at least, to statutory damages, and thus New Bunren's motion for summary judgment as to damages will be denied.

## IV.   CONCLUSION

For the foregoing reasons, New Balance's motion for summary judgment (D.I. 58) is granted in part and denied in part.  The Court grants summary judgment in favor of New Balance and against New Bunren on federal trademark infringement under 15 U.S.C. § 1114(1) (Count 1), federal trademark dilution under 15 U.S.C. § 1125(c) (Count 2), and false designation of origin under 15 U.S.C. § 1125(a) (Count 3).  The Court denies New Balance's motion for summary judgment on Delaware trademark dilution under 6 Del. C. § 3313 (Count 4), Delaware deceptive trade practices under 6 Del. C. § 2532 (Count 5), and Delaware trademark infringement and unfair competition (Count 6).  The Court grants New Balance's motion for statutory damages under 15 U.S.C. § 1117(c)(1), but denies New Balance's motion for statutory damages under 15 U.S.C. § 1117(c)(2) and attorneys' fees under 15 U.S.C. § 1117(a) or (b).  The Court denies New Bunren's motions for summary judgment on non-infringement and damages.  (D.I. 52; D.I. 54).